# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**PAULA HARRIS, MICHAEL HARRIS, and**   )
**SEANA HARRIS,**   )
   )
     **Plaintiffs,**   )
   )
     **v.**   )     **Civil Action No.**
   )     **13-12275-FDS**
**TIMOTHY NORRIS, MICHAEL**   )
**McDONOUGH, MICHAEL DONOVAN,**   )
**ROBERT REIDY, and RALPH POLAND,**   )
   )
     **Defendants.**   )
_____)

## MEMORANDUM AND ORDER ON
## MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

     This action arises out of a home entry by police officers and a probation officer to effectuate the arrest of plaintiff Seana Harris. Plaintiffs contend that defendant probation officer Timothy Norris and defendant police officers Michael McDonough, Michael Donovan, Robert Reidy, and Ralph Poland violated their rights under the Fourth Amendment by (1) entering their home without a reasonable belief that Seana Harris (whom they concede was the subject of a valid arrest warrant) was present in the home and (2) exceeding the permissible scope of the search once they had entered the home. Plaintiffs have brought suit under 42 U.S.C. § 1983 for alleged violations of the Fourth Amendment.

     The defendant police officers and defendant Norris have filed two separate motions for summary judgment. For the reasons set forth below, both motions will be denied.

# I.    Background

## A.    Factual Background

The following facts are undisputed unless otherwise indicated.

In November and December 2010, plaintiff Seana Harris was on probation after having been convicted on multiple charges of larceny.  (Norris SMF ¶ 1; Dep. of Seana Harris at 21). She was supervised by Probation Officer Denise Pelchat of the Plymouth District Court Probation Department.  (Norris SMF ¶ 1, 4).  Her home address at that time was 59 Helena Road in Marshfield, Massachusetts, where she lived with her parents (plaintiffs Michael and Paula Harris) and her two sons.  (*Id.* ¶ 2).

Among the conditions of Seana's probation were that she should refrain from the use of illicit drugs and that she should submit to drug screenings.  (*Id.* ¶ 5).  On November 19, 2010, Officer Pelchat applied for a warrant for Seana's arrest for a probation violation.  (*Id.* ¶ 6). Pelchat stated in the application that Seana had failed a drug test, failed to appear for a subsequent drug test, and admitted that she had abused the drug Percocet.  (*Id.*).  On the basis of that application, two warrants issued for Seana's arrest on November 19.  (*Id.* ¶ 7).[1]  Notice of the warrants was sent to Seana's home on that same day, along with a notice of a "surrender hearing" on Wednesday, December 8, 2010, at which she was ordered to appear.  (Officers' SMF ¶¶ 75, 76; Dkt. No. 49, Ex. I).  The Harrises received the notice shortly thereafter.  (Norris SMF ¶ 8; Seana Harris Dep. at 32).

After she learned that there were warrants out for her arrest, Seana went into hiding. (Norris SMF ¶ 10).  She stayed with her friend Stephanie in the neighboring town of Duxbury to

---

[1] The two warrants appear to have been issued for violation of probation with respect to two separate criminal convictions.  (*See* Officers' SMF ¶ 76).

avoid arrest and to "detox" prior to her surrender hearing. (*Id.*). During that period, she failed to

return at least one telephone call from Officer Pelchat. (*Id.*). She did not inform the Plymouth

Probation Department of her whereabouts at any point while she was staying with Stephanie.

(*Id.* ¶ 11).

According to the testimony of Paula Harris, Marshfield police officers went to the Harris

residence at 7:00 a.m. on an unknown date a few weeks prior to December 8. (Paula Harris Dep.

at 25-27). She testified that they told her "there was a warrant for Seana, and [that] they

wanted—they asked permission to come into my home" and that she responded, "Absolutely."

(*Id.* at 27). She testified that she "opened the door, let them in, walked them through the entire

house, opened closets." (*Id.* at 26). The officers did not ask Paula to open any bureau drawers.

(*Id.* at 26-27).[2]

On the morning of December 8, according to his testimony, Michael Harris left his house

and noticed a black car across the street with a man sitting inside of it. (*Id.* at 17-18). He

testified that he made note of it at the time, as he considered it "odd for a car with a person to be

on [his] street because it's very quiet." (*Id.* at 18). He further testified that Paula and Seana

were not home as of the time he left the house, and that he did not know where Seana was.

(Michael Harris Dep. at 15-16). He testified that he was away from his house for "two hours,

two and a half hours." (*Id.* at 18).

As of December 2010, Timothy Norris was the acting chief probation officer of the

Plymouth Probation Department. (*Id.* ¶ 12). Norris never served as Seana's probation officer,

_____

[2] The defendant officers do not dispute that the Marshfield police visited the Harris residence on a day "[a] few days prior to" December 8, 2010; that Paula let them in the house; and that they were there because of the warrants for Seana Harris's arrest. (Pl. SMF ¶ 71; Officers' Response to Pl. SMF ¶ 71). Defendant Norris admitted only that Michael and Paula Harris so testified. (Norris Resp. To Pl. SMF ¶¶ 71, 98).

but he was aware of her status. (Pl. SMF ¶ 3; Norris Dep. at 11-12). He does not specifically recall ever having a conversation with her, although he testified that he might have. (Pl. SMF ¶ 3; Norris Dep. at 71-72).

On December 8, 2010, Norris attempted to arrest Seana Harris on the warrants with the help of the Marshfield police. (*Id.*). He first drove to an area near the Harris residence. (Norris Dep. at 25). At some point in the late morning, he called Lieutenant Michael McDonough of the Marshfield Police Department to request assistance in executing the warrants. (Pl. SMF ¶ 39; Norris Dep. at 25).[3]

Upon receiving the call from Norris, Lt. McDonough verified that there was a warrant for Seana Harris's arrest using the warrant management system. (Pl. SMF ¶ 39). He also looked Harris up in the police department's master file and found a listing for a home telephone number. He then used a "reverse lookup" program on the Internet to search that telephone number; the website he used indicated that the number belonged to a land-line telephone in Marshfield. (*Id.* ¶ 40). The website provided no other information about the telephone number, including whether it was associated with Seana Harris or any of the plaintiffs. (*Id.* ¶ 41).

Shortly after Norris called, Lt. McDonough drove to the Harris residence in an unmarked vehicle and without a uniform. (*Id.* ¶ 43). He met Norris in front of the Harris residence; according to McDonough, the two talked briefly and agreed that they would arrest Seana if she was present in the home. (Norris SMF ¶¶ 13-14; Pl. ¶ 44; McDonough Dep. at 17).[4]

---

[3] Norris testified that he determined Seana's address by reading a printed copy of one of the warrants for her arrest. (Norris Dep. at 27). The warrants are in the record; both list Seana's address as 59 Helena Road in Marshfield, Massachusetts. (Dkt. No. 49, Ex. B., at 2-3).

[4] Norris testified that he could not specifically recall what he had said to McDonough before they approached the Harris residence, but that he was "sure" that he had said something to him. (Norris Dep. at 28).

McDonough testified that in approaching the house, he saw no cars in the driveway and was not able to see inside the house, but he was able to hear a dog barking from inside the house. (Pl. SMF ¶ 45). He and Norris then knocked on the front door, but received no response. (*Id.* ¶ 14; Pl. SMF ¶ 46).[5]

According to Lt. McDonough, Norris then told him that he had called the telephone number McDonough had found for Seana and received no response. (Pl. SMF ¶ 47; McDonough Dep. at 20). McDonough testified that Norris stated that the telephone number he had called was 781-536-8851. (Pl. SMF ¶ 47; McDonough Dep. at 21). According to McDonough, the two left the premises after that conversation, and he went back to the police station. (Pl. SMF ¶ 48; McDonough Dep. at 22).

According to Norris, he did not attempt to call any telephone number associated with the Harris residence until after he and Lt. McDonough left the house. (Norris Dep. at 31). He testified that McDonough had asked him whether they had a land-line telephone number that was associated with the Harris house, but that he did not have one when McDonough asked. (*Id.*). He further testified that he first obtained such a telephone number by calling Pelchat on his drive back from the house. (*Id.*; Norris SMF ¶ 15).

Norris testified that when he called the number that Pelchat gave him, a female answered and said "hello," but he hung up without saying anything or otherwise eliciting a further response. (*Id.* ¶ 16; Pl. SMF ¶ 14). He testified that he did not recognize the female's voice. (Pl. SMF ¶ 15). He then called Lt. McDonough, about 15 minutes after they had left the house,

---

[5] Norris testified that another officer (whose identity he could not recall) accompanied McDonough, and that the three of them went to the door together. (Norris Dep. at 28-29). McDonough testified that no officer accompanied him. (McDonough Dep. at 16).

and told him what had happened. (Norris SMF ¶ 17). He testified that McDonough confirmed on the telephone that the number he had dialed was a land-line telephone number in Marshfield, but that he did not know how McDonough had that information. (Norris Dep. at 34). He testified that the number was 781-536-8851. (*Id.* at 57).

According to Lt. McDonough, Norris specifically told him on the telephone that he believed the female who had answered his call was Seana. (McDonough Dep. at 22-23). At that point, McDonough asked three other officers—Michael Donovan, Robert Reidy, and Ralph Poland—to accompany him to the Harris residence. (Officers' SMF ¶¶ 40-41; Pl. SMF ¶ 49).

Norris and the four police officers arrived at the Harris residence shortly thereafter. (Norris SMF ¶¶ 17, 19). According to Lt. McDonough, they arrived at some point in the early afternoon. (McDonough Dep. at 54). McDonough testified that there were still no cars in the driveway, and that the officers began walking around the house "to assess the situation." (Pl. SMF ¶¶ 50-51; McDonough Dep. at 32). McDonough noticed two back doors: a sliding door on the deck and a basement door. (Pl. SMF ¶ 52; McDonough Dep. at 33). He testified that he directed Officers Reidy and Poland to move to the back of the house to watch the back doors. (Pl. SMF ¶ 52; McDonough Dep. at 31).

According to Lt. McDonough, he then approached the front door with Officers Donovan and Norris, and he knocked on the door and announced himself. (Officers' SMF ¶ 41; McDonough Dep. at 34). He testified that he knocked for "[a] few minutes." (McDonough Dep. at 34). He also testified that he thought he heard "faint voices" inside the house. (Officers' SMF ¶¶ 40-41; McDonough Dep. at 31, 35). According to McDonough, he then conferred with

Officers Donovan and Norris, and they decided to enter the house.[6]

At that point, according to Lt. McDonough's testimony, he went around to the back basement door with Officers Reidy and Donovan; Norris remained at the front door, and Officer Poland remained at the back sliding door.  (Pl. SMF ¶ 53; McDonough Dep. 39-40).  McDonough testified that Reidy tried the basement door, found it open, "pushed it open a little bit," and entered.  (McDonough Dep. at 38).[7]  According to McDonough, Donovan was the next to enter, and then he entered third.  (Pl. SMF ¶ 54; McDonough Dep. at 41).  Upon their entry, according to McDonough, Reidy, and Poland, Reidy immediately brought the barking dog upstairs and put it in one of the bedrooms.  (Pl. SMF ¶ 55; McDonough Dep. 31; Dkt. No. 54, Ex. B, at 4; Dkt. No. 54, Ex. D, at 4).[8]  The parties all appear to agree that McDonough then went to the front door and let Norris and Poland inside.  (Officers' SMF ¶¶ 11, 41; Norris SMF ¶ 20; Pl. SMF ¶ 54).

According to McDonough, there had been no conversations among the group as to how to split up the search before they entered the house.  (Pl. SMF ¶ 57; McDonough Dep. at 45).  He testified that he began his search in the basement.  At his deposition, he was asked the following questions and gave the following responses:

> Q.     And so did you move anything?  Did you touch anything or did you just look around?

---

[6] Norris did not testify as to that conversation.  (*See* Norris Dep. at 32-40).

[7] Officers Reidy, Donovan, and Poland all stated, in their responses to interrogatories, that the basement door was "open" (Reidy), "unsecured" (Donovan) or "unlocked" (Poland).  (Dkt. No. 54, Ex. B, at 4; Dkt. No. 54, Ex. C, at 6; Dkt. No. 54, Ex. D, at 4).

[8] McDonough testified that Officer Reidy had been chosen to enter first, because he served as the "canine officer" and the dog inside the house "sounded pretty aggressive."  (McDonough Dep. at 38).

      A.      Just looked around.

      Q.      Okay.  You didn't touch a thing in the basement?

      A.      Not that I recall.

(McDonough Dep. at 46).  He also testified that the entire search of the basement took "[l]ess

than a minute."  (*Id.*).  He later testified that, after he moved to the main floor of the house, he

noticed a television on; according to his testimony, he did not touch it or turn it off.

(McDonough Dep. at 47).[9]  He later testified that he had no knowledge of any of the

officers—including Norris—having opened any drawers in the house, thrown any clothes on the

floor, or broken any doors in the house.  (*Id.* at 73-74).

      After Norris entered the residence, he walked through the halls looking for Seana.

(Norris Dep. at 41-42).  He testified that he had no recollection of seeing or hearing a dog or

hearing a television or radio.  (*Id.* at 40).  According to his testimony, he and the other officers

had a conversation in the kitchen of the house during which they agreed that Seana was not in

the house.  (*Id.* at 41).

      Norris further testified that while he was in the house, he tried calling the number that he

had called earlier to verify that it belonged to the house's land-line telephone.  (*Id.* at 42).  At his

deposition, he was asked the following questions and gave the following responses on that

subject:

      Q.      So you dialed it on your cell phone while you were in the house?

      A.      Correct.

      Q.      And there was no phone ringing?

---

[9] Officers Reidy, Donovan, and Poland, in their responses to interrogatories, also stated that a television was on in the house.  (Dkt. No. 54, Ex. B, at 4; Dkt. No. 54, Ex. C, at 6; Dkt. No. 54, Ex. D, at 4).

> A.      Correct.
>
> Q.      Did you see a phone somewhere?
>
> A.      I saw a phone in the kitchen.
>
> Q.      Okay. What did you next?
>
> A.      I didn't know if she unplugged the phone. I didn't know. I kept calling the phone number, seeing if it was ringing. It wouldn't ring.
>
> Q.      Did you check the phone in the kitchen to see if it was plugged in or had a dial tone?
>
> A.      No, I didn't do that.

(*Id.* at 42-43).

None of the defendants was able to locate Harris in the house, and there is no dispute that she was not there. (Officers' SMF ¶ 42).

After leaving the Harris house, Norris returned to the courthouse where he worked. He then checked the land-line number that had been given to him by Pelchat on a free Internet website. (Norris Dep. at 45-46, 96-97). He testified that he printed out a screenshot a few weeks later and gave it to an Assistant Attorney General. (*Id.* at 96-97). As to his reason for checking the number, he testified: "With the phone not ringing in the house, I wanted to make sure that that was the correct line that I called. So, yeah, I wanted to verify the number that was given to me was the right one." (*Id.* at 46).

As noted above, Norris testified that the telephone number he called was 781-536-8851. (*Id.* at 57). The call records for Norris's cellular phone, submitted by plaintiffs as Exhibit A to their response to Norris's statement of material facts, do not reflect any calls to that telephone number on December 8, 2010. (Dkt. No. 56, Ex. A, at 4-5). The records do, however, reflect

seventeen calls to the telephone number 781-536-8503 between 1:36 p.m. and 1:52 p.m.  (*Id.*).

Shortly after he checked the telephone number, Norris discovered that his work identification card had been lost.  (Norris SMF ¶ 25).  He called Lt. McDonough and asked him to return to the Harris residence to look for the identification card.  (*Id.* ¶ 26; Pl. SMF ¶ 59). McDonough testified that he agreed to go back to the house to look for it, but that he "got tied up with something" and did not go.  (Pl. SMF ¶ 59; McDonough Dep. at 54-55).  Norris testified that McDonough called him and told him that he had gone back to the house but had not been able to locate the ID.  (Norris Dep. at 46-47).

Michael Harris testified that when he returned home, he found a man's identification card on the front interior stairs of the house.  (*Id.* ¶ 27; Michael Harris Dep. at 18-19).[10]  He testified that he recognized the photo on the ID card as depicting the man that he had seen sitting in a black car in front of his house that morning.  (Michael Harris Dep. at 17-19).  He testified that as he went upstairs, he found his dog in the hallway and noticed that she was "very nervous."  (*Id.* at 19).  He testified that he then went downstairs to the laundry room and "noticed a bunch of clothes . . . that were all over the floor," instead of on the table where he had left them.  (*Id.* at 19-20).

Michael testified that, when he looked at the basement door from the inside upon returning home, he noticed that the door frame was cracked and that "the doorknob was—it was pushed back in."  (*Id.* at 20-21).  He testified that he also noticed "a small indent of a footprint" on the door and that the lock was broken as well.  (*Id.* at 21).  He testified that he was sure the door was not damaged prior to that day, because he "used it all the time."  (*Id.*).  He had not

---

[10] The Harris residence is a split-level house.  (Pl. SMF ¶ 56).

fixed the door as of July 1, 2014 (the date of his deposition), but had placed a washing machine in front of it to prevent access to the home.  (*Id.* at 21-22).[11]

After Michael went upstairs, according to his testimony, he noticed that "the first three drawers" of Paula's bureau were open, and that "socks and stuff were like out of the—hanging out of the drawers."  (*Id.* at 22).  He testified that he also noticed that the sliding door was closed, but not locked.  (*Id.* at 23).

According to Michael, he then went outside to look at the grounds and his yard.  (*Id.* at 23).  At that point, according to his testimony, one of his neighbors told him that police officers had been to the Harris house twice while he was away.  (*Id.* at 23-24).

The defendant police officers do not dispute that Michael then went to the police station and asked to talk to someone about what had happened.  (Pl. SMF ¶ 78; Officers' Resp. to Pl. SMF ¶ 78).[12]  Michael testified that he talked to a police officer who "looked like an Italian fellow."  (Michael Harris Dep. at 24).  As to their conversation, Michael testified:  "I don't remember his name, but I said to him, 'I want to know why you went to—came into my house.'  He said, 'because we had every right to.'  I said, 'Really?'  He said, 'Yeah, we have a search warrant.'"  (*Id.* at 24-25).

Michael and Paula Harris both testified that Michael gave the identification card he had found to Paula, and that she gave it to Seana's attorney the next day.  (*Id.* at 28; Paula Harris Dep. at 24, 62-63).

---

[11] Paula testified:  "[The door] was wedged totally—the whole base of the door was busted in.  the whole thing was separated from the wall."  (Paula Harris Dep. at 16).  She testified it was "never like this before."  (*Id.* at 17).  Seana testified: "[T]o me it looks like someone literally kicked in the door."  (Seana Harris Dep. at 46).

[12] Defendant Norris did not admit that fact.  (Norris Resp. to Pl. SMF ¶ 78).

Paula testified that on the day of the incident, Michael called her at work to tell her about the alleged damage to their house. (Paula Harris Dep. at 77-78). She testified that when she arrived home, she found "things pulled out and ripped open in disarray." (*Id.* at 21). Asked what had been pulled out, she testified: "All my bureau drawers, the boys' bureau drawers, Seana's, the closets. I had a door in my closet in my bedroom. That was wide open. Things were off the racks, you know, clothes on the floor that I had that was all hung up." (*Id.* at 22). She was then asked the following questions and gave the following responses:

Q. What was thrown on the floor?

A. I have all my clothes hanging up on the racks. Everything was pulled off, on the floor in disarray. Drawers were pulled out. Clothes were pulled out.

Q. So you are saying that the clothes were pulled out of the drawers?

A. Yes.

Q. And the clothes were pulled out of the closet?

A. Yeah, they were all on the floor in the closet. Not pulled out, but just like taken off or pulled at. Some of the coat hangers were hanging.

Q. Anything else?

A. Just the shower curtain was open. My—there was a door down in my family room, too, that was left open. It's under the stairs. That's never left open.

(*Id.* at 22-23).

Paula testified that she also noticed that the sliding door "was kind of off the track"; she further testified it "wasn't broken like that before" and that "[w]hen you pull[] the slider, it kind of loosens now." (Paula Harris Dep. at 18). The sliding door had not been fixed as of Paula's deposition; she testified that, two weeks prior to the deposition, she had asked a company to estimate the cost of repair on the door and had been told it would cost $4,800. (*Id.* at 73).

Michael, Paula, and Seana Harris all testified that they noticed shortly after the incident that the door to one of the back bedrooms in the house had become damaged. (Michael Harris Dep. at 50; Paula Harris Dep. at 20). Michael testified as follows: "My understanding I believe is that they shut—they put [the Harris's dog,] Angel[,] in one of the back bedrooms on the right because I seen the doors all gouged out." (Michael Harris Dep. at 50). Paula testified that the door "was all scratched from the dog trying to get out." (Paula Harris Dep. at 20). Seana testified that the officers "definitely locked my dog in the room, probably from somebody being scared of the dog, because there were scratches on the back of my children's door." (Seana Harris Dep. at 47).

On December 10, 2010, Paula wrote a letter to a man named Rob Corbett to complain about the probation office's role in the incident at her home on December 8. (Paula Harris Dep. at 11-13). Paula testified that she was advised that Corbett was "in charge of probation" by either Seana's attorney or "somebody at the courthouse." (*Id.* at 12).

Paula testified that because of the incident, she "do[es] not feel safe any longer in [her] home." (*Id.* at 31). She testified: "I just don't feel safe in Marshfield just because of the incident that transpired at my house. . . . I'm embarrassed. I get anxiety very much from it. I just don't feel safe." (*Id.* at 31-32). She further testified that she has seen a counselor and has been taking the drug Klonopin for her anxiety. (*Id.* at 32).

Seana testified that she attends counseling sessions weekly, partially as a result of her belief that the police broke into her home on December 8, 2010. (*Id.* at 60).

According to Paula's testimony, the Harris's home telephone number on December 8, 2010, was 781-536-8448. (*Id.* at 75-76). She testified that the number 781-536-8851 was their

home telephone number at some other point.  (*Id.*).[13]

### B.  Procedural Background

Plaintiffs filed their initial complaint on September 13, 2013.  On March 17, 2014, with leave of the Court, plaintiffs filed an amended complaint.  The police officers and Norris have moved separately for summary judgment.

## II.  Legal Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (footnotes omitted).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present

---

[13] Seana testified that she had no memory of 781-536-8851 having ever been the phone number for the Harris residence.  (Seana Harris Dep. at 54).

affirmative evidence." *Id*. at 256-57.

**III.**    **Analysis**

Plaintiffs contend that defendants violated their right to be free from "unreasonable searches," as protected by the Fourth Amendment, in two distinct ways. First, plaintiffs contend that defendants did not have a reasonable belief that Seana Harris was present in the Harris residence as of the time they arrived on the premises, and thus their entry into the home was unlawful. Second, they contend that defendants exceeded the permissible scope of the arrest warrant by searching in spaces within the home (such as bureau drawers) that were too small to reasonably conceal her.

Defendants raise, among other defenses, the doctrine of qualified immunity. Qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is evaluated by reference to a two-part test. *Pearson v. Callahan*, 555 U.S. 223 (2009); *Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir.2009). The relevant inquiries are (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of defendant's alleged misconduct. *Pearson*, 555 U.S. at 224; *Maldonado*, 568 F.3d at 269.

Because the qualified-immunity inquiry encompasses the constitutional inquiry, the Court will analyze each alleged constitutional violation within the qualified-immunity framework.

15

A.    **Whether Defendants Reasonably Believed Seana Was Inside the Home**

1.    **Constitutional Analysis**

Officers executing an arrest warrant have "limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 602 (1980). *Payton* established a "two-prong inquiry" that requires courts to ask whether the entering officers had a sufficient basis to believe that the suspect (1) lived at the residence in question and (2) was at home at the time of their entry. *United States v. Werra*, 638 F.3d 326, 337 (1st Cir. 2011) (citing *Payton*, 445 U.S. at 603). To satisfy the constitutional standard, officers need only possess a "reasonable belief that the target named in the arrest warrant resides at the dwelling in question and will be present at the time of the entry"; they need not meet the more demanding "probable cause" standard. *Solis-Alarcon v. United States*, 662 F.3d 577, 580-81 (1st Cir. 2011). "[A]ctual viewing of the suspect on the premises is not required" to meet the "reasonable belief" standard, but "the officers must point to at least some evidence suggesting that the individual named in the arrest warrant is present. *Werra*, 638 F.3d at 339 (citing *Valdez v. McPheters*, 172 F.3d 1220, 1226 (10th Cir. 1999)). Generally speaking, "consideration of common sense factors and the totality of the circumstances is sufficient to formulate a reasonable belief that a suspect is on the premises." *United States v. Pruitt*, 458 F.3d 477, 483 (6th Cir. 2006). Furthermore, the degree of (justified) certainty possessed by the officers as to the first prong can properly inform the analysis of the second prong—that is, if officers have strong or overwhelming evidence that a suspect lives at a particular location, the quantum of evidence required to justify their belief that she is present at a particular time may be reduced. *See Werra*, 638 F.3d at 340 ("The fact that an individual is known to live at a particular

location is one sound reason to expect him or her to be there.") (citing 2 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 6.1(a) (4th ed. 2004) ("[T]he police need not possess 'special knowledge' that the defendant is at home . . . for in the absence of facts tending to show that the defendant is not at home it is reasonable to infer that he would be there.")).

Here, there is no dispute that Seana Harris lived at the residence located at 59 Helena Road in Marshfield. Moreover, all defendants clearly had a reasonable belief that Seana lived there. The Marshfield Police had been to the residence on at least one prior occasion to effectuate the subject arrest warrants, and Paula Harris had allowed them inside to look for her daughter. The police department thus had direct knowledge that she lived there. In addition, Seana had been on probation for a period of some months prior to the attempted execution of the arrest warrants, and the warrants directly listed Seana's address as 59 Helena Road. Although defendant Norris was not Seana's personal probation officer, he was the acting chief probation officer and communicated with Seana's probation officer (Denise Pelchat) on the morning of the arrest. Whether through conversation with Pelchat, a review of the warrants themselves, or conversation with the defendant police officers, defendant Norris clearly had reason to believe that Seana lived at 59 Helena Road.

The dispute thus centers on the second prong of the *Payton* inquiry: whether defendants had a reasonable belief that Seana was home at the time they entered the residence. *See Werra*, 638 F.3d at 337 (citing *Payton*, 445 U.S. at 603). Construing the facts in the light most favorable to plaintiffs, defendants had the following pieces of information that could have contributed to their belief that Seana was inside the home at the time of their arrival. First, they had actual knowledge—or at least very strong evidence—that Seana lived at 59 Helena Road. *See Werra*,

638 F.3d at 340 ("The fact that an individual is known to live at a particular location is one sound reason to expect him or her to be there.")  Second, defendant Norris had obtained a phone number for Seana from her probation officer, called it at least once, and heard a female voice answer the phone.  He also relayed that information to defendant McDonough.  Third, defendant Norris had observed the house for a short period of time prior to the entry, stretching at least from the late morning until the early afternoon.  He and McDonough had approached the house together before returning and entering.  At no point during that period did Norris or McDonough witness Seana's leaving the house.

As for evidence tending to show the opposite—that Seana was not at home—defendants were aware of the following.  First, on both occasions that they approached the house, they saw no cars in the driveway.  Second, they heard a dog barking inside the house during both visits, which (when construed in the light most favorable to plaintiffs) could be viewed as evidence that it was unsecured, uncontrolled, and perhaps unaccompanied by humans.  Finally, they entered the house in the early afternoon on a Wednesday, at a time when individuals who work are relatively unlikely to be home.[14]

Although the balance of evidence is not strongly weighted in either direction, the Court finds that defendants possessed sufficient knowledge on which to base a "reasonable belief" that Seana was home at the time of their entry.  First, because her actual residence was not in doubt, it was reasonable for them to infer that she was there "in the absence of facts tending to show that [she was] not at home."  2 LaFave, Search and Seizure § 6.1(a).  The only such facts of

---

[14] Defendants have put forth no evidence demonstrating that they knew or reasonably believed Seana to be unemployed, and the Court cannot assume that such evidence exists.  *See Werra*, 638 F.3d at 340 (holding that "[t]he fact that [the suspect] was a drug abuser . . . does not reveal her employment status").

which they were aware were the absence of cars, the presence of the barking dog, and the time of day. Those facts, standing alone, provided only minimal proof that Seana—who was known to live at home with her parents—was not at home.

Assuming for the sake of argument that those facts would negate an otherwise-reasonable inference that Seana was at home based on her address alone, the circumstances of the telephone call provided sufficient corroborating evidence to draw such an inference. Defendant Norris called a number that he had been told (by her probation officer) belonged to Seana, and he heard a female answer the phone. He then relayed that information to the defendant police officers. Defendants also knew that, just 15 minutes prior to the phone call, Norris and McDonough had knocked on the door of the Harris home, announced themselves as officers, and received no response. That information, taken together, supports the inference that the female who answered the phone may have chosen not to open the door so as to avoid the police.

In short, defendants had reason to believe that a female was inside the Harris residence. They could not definitively conclude that that female was Seana Harris, but definite knowledge is not the standard for an entry to be reasonable under *Payton*. Indeed, even the "more demanding probable cause test" need not be met for an officer's entry into a home with a valid warrant to be constitutional; only a "reasonable belief" is required. *Solis-Alarcon*, 662 F.3d at 580-81. Under the circumstances presented here, it appears that all defendants had a sufficient basis on which to form a reasonable belief both that Seana Harris lived at 59 Helena Road and that she was present at the time of their entry.

## 2. <u>Qualified Immunity</u>

Because the Court finds no constitutional violation in defendants' entry of the Harris

residence, the second step of the qualified-immunity analysis is not strictly necessary.  However, a cursory consideration of the second step confirms the Court's conclusion.

Federal and state officers sued under 42 U.S.C. § 1983 enjoy "qualified immunity where the officer acted in the absence of guidance 'sufficiently clear that a reasonable official' would understand that he was violating a right."  *Solis-Alarcon*, 662 F.3d at 581 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  "Qualified immunity applies not only to the question whether a constitutional right exists but also to the judgment whether the general standard applies to the facts at hand."  *Id.*  "[I]f officers of reasonable competence could disagree on th[e] issue, immunity should be recognized."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  "[I]n the end, qualified immunity against personal liability exists even for constitutional mistakes and 'protects all but the plainly incompetent or those who knowingly violate the law.'"  *Solis-Alarcon*, 662 F.3d at 581. (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (internal quotation marks omitted)).

Here, the right to be free from unreasonable searches is a "clearly established . . . constitutional right[]," *see Harlow*, 457 U.S. at 818, and the general restrictions on officers effectuating an arrest warrant in the suspect's home are also well-established.  *See Werra*, 638 F.3d at 336-37 (citing *Payton*, 445 U.S. at 603).  However, under the specific facts presented here, the applicability of those general standards would not have been obvious to a reasonable officer.  In other words, because the indicators that Seana was present at 59 Helena Road were, at a minimum, close to establishing a "reasonable belief" that she was present (even if the Court's conclusion that they did establish such a reasonable belief is incorrect), the officers cannot be said to have acted in a "plainly incompetent" manner or one that indicated they were

"knowingly violat[ing] the law." *See Ashcroft*, 131 S. Ct. at 2085 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Thus, even "[a]ssuming that the [officers]' judgment was unreasonable, it was not 'manifestly unreasonable'." *See Solis-Alarcon*, 662 F.3d at 582 (quoting *Ringuette v. City of Fall River*, 146 F.3d 1, 5 (1st Cir. 1998)).

For that reason, qualified immunity would shield all defendants from liability on plaintiffs' claim that they unlawfully entered the Harris residence in effectuating the arrest warrants.

**B.**      **Whether Defendants Exceeded the Permissible Scope of the Warrants**

**1.**      **Constitutional Analysis**

Although a valid arrest warrant permits arresting officers to enter a residence under some circumstances, it does not permit them to take actions "unrelated to the objectives of the authorized intrusion." *Arizona v. Hicks*, 480 U.S. 321, 325 (1987). A search for a suspect within a residence must be "limited to places where [the suspect] might reasonably be hiding." *See Solis-Alarcon*, 662 F.3d at 582. In other words, officers are limited to searching within areas—like rooms or closets—that are large enough to conceal the person who is the object of the search. *See United States v. Gray*, 814 F.2d 49, 51 (1st Cir. 1987) ("As a general proposition, any container situated within residential premises which are the subject of a validly-issued warrant may be searched if it is reasonable to believe that the container could conceal items of the kind portrayed in the warrant."); *Bradway v. Gonzales*, 26 F.3d 313, 316 (2d Cir. 1994) (holding that the verdict form in an action alleging an unlawful home search pursuant to an arrest warrant should have asked the jury "if the Troopers exceeded the scope of the search authorized by [the] arrest warrant by searching through drawers, wallets, and other

21

compartments too small to contain [the suspect]").

Here, there is a dispute of fact as to whether defendants opened bureau drawers and removed clothing from those drawers. Plaintiffs contend that when they returned home, they found bureau drawers opened that had been closed when they left that morning; defendants deny opening any drawers. At the summary judgment stage, the Court is required to construe the facts in the light most favorable to plaintiffs. Accordingly, the Court must assume for the purposes of this motion that defendants did open bureau drawers.

On that assumption, the motion for summary judgment must be denied. If defendants truly opened bureau drawers and left the Harris residence in "disarray," as Paula Harris testified at her deposition, then they may have violated plaintiffs' rights under the Fourth Amendment.

### 2.      Qualified Immunity

As stated above, federal and state officers sued under 42 U.S.C. § 1983 enjoy "qualified immunity where the officer acted in the absence of guidance 'sufficiently clear that a reasonable official' would understand that he was violating a right." *Solis-Alarcon*, 662 F.3d at 581 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "[Q]ualified immunity against personal liability exists even for constitutional mistakes and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Solis-Alarcon*, 662 F.3d at 581. (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (internal quotation marks omitted)).

Here, the restriction that officers effectuating an arrest warrant in a home must refrain from actions that are "unrelated to the objectives of the authorized intrusion" is clearly established. *See Hicks*, 480 U.S. at 325. Moreover, the application of that principle to the circumstances presented here would be "sufficiently clear that a reasonable official" would

22

understand that the actions plaintiffs contend occurred would violate plaintiffs' constitutional rights. No reasonable officer could have concluded that Seana Harris was likely to be hiding inside a bureau drawer, or that it was necessary to remove clothing from those drawers to search for her. *See Solis-Alarcon*, 662 F.3d at 582 (holding that if officers executing an arrest warrant "opened kitchen drawers and looked through . . . mail, [that] would need explaining").

Accordingly, taking the facts as stated in plaintiffs' deposition testimony, defendants exceeded the permissible scope of their arrest warrants, and their actions were not protected by the doctrine of qualified immunity.

### 3.    Additional Contentions by Defendants

The police-officer defendants contend that Mass. Gen. Laws ch. 276, § 23A immunizes them from liability. That statute states as follows:

> No law enforcement officer, who in the performance of his duties relies in good faith on the warrant appearing in the warrant management system and, in turn, the criminal justice information system, shall be liable in any criminal prosecution or civil action alleging false arrest, false imprisonment, or malicious prosecution or arrest by false pretense.

Mass. Gen. Laws ch. 276, § 23A. The statute is inapplicable for at least three reasons. First, it is a state statute that cannot override federal constitutional requirements. Second, it refers to claims for "false arrest, false imprisonment, or malicious prosecution or arrest by false pretense"; plaintiffs have made no such claims. Third, it appears to contemplate a situation in which an officer relies in good faith on a facially valid warrant that is later found or alleged to be invalid; here, there is no dispute that the warrant was valid. For that reason, Mass. Gen. Laws ch. 276, § 23A provides defendants with no additional basis for immunity.

Finally, defendants appear to contend that their motions must be granted because

plaintiffs have not sufficiently proved any damages. (*See* Norris Mem. at 7-8 n. 4); (Officers'

Mem. at 2, 18). The Court need not resolve whether plaintiffs have put forth evidence of

damages, because "a plaintiff who suffers a deprivation of an absolute right, but who is unable to

prove actual damages, is 'entitled to recover nominal damages not to exceed one dollar.'"

*Fassett by and Through Fassett v. Haeckel*, 936 F.2d 118, 121 (2d Cir. 1991) (quoting *Carey v.*

*Piphus*, 435 U.S. 247, 266-67)).[15]

IV.    <u>Conclusion</u>

        For the reasons set forth above, the motion for summary judgment by defendant Norris is

DENIED. The motion for summary judgment by the defendant police officers is likewise

DENIED.

**So Ordered.**

                                                          /s/ F. Dennis Saylor
                                                          F. Dennis Saylor IV
Dated: May 22, 2015                                       United States District Judge

---

[15] It is unclear from the memoranda in support of defendants' motions whether they also contend that summary judgment must be granted for plaintiffs' failure to put forth specific proof of *which* defendant opened any bureau drawers and thereby exceeded the permissible scope of the search. To the extent defendants so contend, the argument would appear to be foreclosed by the doctrine of *res ipsa loquitur*, which allows for an inference of liability in the case of unexplained, but clear, misconduct. *See Johnson v. United States*, 333 U.S. 46, 49 (1948) (explaining that *res ipsa loquitur* allows "permissible inferences from unexplained events").